**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-2120**

_____

TINA RAY,

Plaintiff - Appellant,

v.

MICHAEL ROANE, in his individual capacity,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth Kay Dillon, District Judge.  (5:17-cv-00093-EKD-JCH)

_____

Argued:  December 6, 2023                    Decided:  February 22, 2024

_____

Before GREGORY and HARRIS, Circuit Judges, and FLOYD, Senior Circuit Judge.

_____

Vacated and remanded by published opinion.  Judge Harris wrote the majority opinion, in which Judge Gregory and Judge Floyd joined.

_____

**ARGUED:**  John Michael Shoreman, MCFADDEN & SHOREMAN, Washington, D.C., for Appellant.  Carlene Booth Johnson, PERRY LAW FIRM, PC, Dillwyn, Virginia, for Appellee.  **ON BRIEF:**  Mario Bernard Williams, HDR LLC, Atlanta, Georgia, for Appellant.

_____

PAMELA HARRIS, Circuit Judge:

Michael Roane, a police officer, shot and killed Tina Ray's dog while attempting to serve an arrest warrant. In a previous decision, we reversed the dismissal of Ray's action against Roane, identifying two material allegations that, if substantiated, would support an inference that the shooting was unnecessary and therefore unconstitutional under the Fourth Amendment. Because discovery yielded a genuine dispute about those material facts, it now falls to a jury to decide which side of the dispute to credit. We therefore vacate the district court's entry of summary judgment in Roane's favor and remand for trial.

## I.

### A.

This case began in 2017, when four Augusta County law enforcement officers arrived at Tina Ray's house to serve an arrest warrant and protective order. They were greeted by Tina Ray; two of Ray's friends; and Ray's dog, a 150-pound German shepherd named Jax. The officers called Deputy Sheriff Michael Roane for investigative support, and the whole group waited at a picnic table in Ray's yard for 30 or 40 minutes until Roane arrived.

Jax lounged nearby, tethered somewhat unconventionally to a 25-foot "zip line" connecting two trees in the yard. He remained tethered throughout a rapidly developing

2

episode that began when Roane arrived and ended when Roane shot Jax dead. Ray then sued for unreasonable seizure under the Fourth Amendment.[1]

**B.**

Roane moved to dismiss Ray's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Because the ultimate disposition of that motion bears substantially on this appeal, we describe it in some detail here.

1.

At the motion to dismiss stage, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). In her complaint, Ray alleged that Roane arrived dramatically on the scene in his truck, "barreling" down her driveway, "screeching to a halt" under the zip line, and "slamm[ing] the door" as he exited. J.A. 12–13. Alarmed, "Jax began barking while approaching Roane." J.A. 13. Roane drew his gun and retreated, moving backwards until "Jax had reached the end of his line and could not get any closer to Roane." J.A. 13. At that point, recognizing Jax's inability

---

[1] Ray also pursued a constitutional substantive due process claim, a claim for intentional infliction of emotional distress under Virginia law, and a claim for conversion under Virginia law. She abandoned the first two in the district court, and now abandons the latter in this court. *See infra* note 3. Consequently, we address only the Fourth Amendment claim.

3

to advance further, Roane stopped his retreat, "took a step towards the dog so that he stood over Jax," and shot Jax in the head.  J.A. 13, 21.

Roane moved to dismiss on the ground that he mistakenly but reasonably believed Jax to be unrestrained at the time of the shooting.  Mem. in Support of Mot. to Dismiss at 8, *Ray v. Roane*, No. 5:17-cv-00093-EKD-JCH (W.D. Va. Nov. 1, 2017), ECF No. 4.  In those circumstances, Roane argued, his decision to shoot fell within the bounds of Fourth Amendment reasonableness.  *Id.*  At a minimum, Roane contended, he was entitled to qualified immunity, because his efforts to protect himself against the threat posed by Jax were not clearly unreasonable.  *Id.* at 9–14.

The district court granted Roane's motion to dismiss.  *Ray v. Roane*, No. 5:17-cv-00093, 2018 WL 4515893, at *9 (W.D. Va. Sept. 20, 2018).  Ray had not stated a Fourth Amendment claim, the court concluded, because Jax's size and aggression caused Roane reasonably to fear for his safety, especially given the "split-second" nature of the interaction.  *Id.* at *4.  The court acknowledged Ray's allegation that Roane "calmly . . . stepped towards Jax" before shooting him, which, according to Ray, evinced Roane's knowledge that Jax had reached the end of his lead and no longer posed a threat.  *Id.*  But "the fact that Roane was able to act calmly in the face of danger," the court reasoned, "does not mean that [Roane] did not assess Jax" – who was "within one step" of the officer – "to

4

be a threat." *Id.* And for the same reasons, the court held in the alternative that Roane was shielded by qualified immunity. *Id.* at *8.

2.

On appeal, we reversed the judgment of the district court. As we read the complaint, its allegations would support an inference that Roane did not reasonably perceive Jax as a threat to his safety and shot him nevertheless, in violation of clearly established Fourth Amendment law. *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020).

We first recognized, as the parties agree, that the Fourth Amendment protects the interest of individuals in dogs they keep as pets. *Id.* at 227 (citing *Altman v. City of High Point*, 330 F.3d 194, 203–05 (4th Cir. 2003)). To assess the constitutionality of a shooting of a family dog, we "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* Both sides have strong interests: the individual in "Man's Best Friend," *id.* (quoting *Altman*, 330 F.3d at 205), and the government "in protecting citizens and officers from dogs that may be dangerous or otherwise a source of public nuisance," *id.* And in weighing the government's side of the balance, we recognized, we must account for the officer's need "to make split-second judgments," and consider "only the information known" to the officer "at the time of the shooting." *Id.*

We then applied those "well-settled" principles to the case before us. *Id.* If, given the information known to Roane, a reasonable officer would have believed that shooting Jax was necessary to protect the asserted interest in officer safety, then the Fourth Amendment would permit that shooting – and if not, the shooting would violate the Fourth

Amendment. *Id.* "Our task," at bottom, was to "place ourselves in the shoes of Roane and ask whether his actions were objectively unreasonable." *Id.*

And if the complaint's allegations were credited, we held, then Roane's shooting of Jax may indeed have been unreasonable. *Id.* at 228. We identified two factual allegations as especially material to this assessment: "According to the complaint, Roane stopped backing away from Jax when the dog reached the end of the zip-lead, and then took a step toward the dog before firing his weapon." *Id.* Together, those factual allegations – that Roane stopped his retreat and then stepped forward before shooting – "yield the reasonable inference that Roane observed that the dog could no longer reach him, and, thus, could not have held a reasonable belief that the dog posed an imminent threat." *Id.* Only by failing to "fully credit" these allegations "and the inferences arising therefrom," we concluded, could it be said that Ray's complaint failed to state a Fourth Amendment claim. *Id.*; *see DePaola v. Clarke*, 884 F.3d 481, 484 (4th Cir. 2018) (in considering a motion to dismiss, court must "accept as true the factual allegations set forth in [the] complaint and draw reasonable inferences therefrom in [the plaintiff's] favor").

We turned then to the question of qualified immunity. By the time of the shooting in 2017, we determined, it was clearly established by our own decision in *Altman*, 330 F.3d at 203–05, and the consensus of our sister circuits that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Ray*, 948 F.3d at 230 (quoting *Robinson v. Pezzat*, 818 F.3d 1, 7 (D.C. Cir. 2016) (describing uniform circuit authority)). Roane's argument to the contrary, we explained, did not "contest [that] legal principle," but instead focused exclusively "on the

6

underlying facts," contending that Roane's conduct was consistent with this well-established standard because he "reasonably perceived Jax as a threat at the time of the shooting." *Id.* But for the same reasons we gave in connection with Roane's merits argument, we held, we could not simply accept Roane's version of the facts over the allegations in Ray's complaint at the motion-to-dismiss stage of the proceedings, which "tests the sufficiency of the complaint, not its veracity." *Id.*

## C.

To test the veracity of Ray's complaint, the parties proceeded to discovery. Witnesses gave similar accounts of the episode's general contours but disagreed on the details. Most significantly, they split as to the allegations we had identified as critical in our *Ray* decision: that Roane had stopped retreating and stepped forward before shooting Jax. Three witnesses, including Roane, testified to the effect that Roane "was backpedaling the whole time" – that is, until the moment of the shooting. J.A. 620 (Officer Smith); *see also* J.A. 61–62, 86, 112–14 (Roane); J.A. 662–63, 674 (Trooper Lotts).[2] Two witnesses testified that they were uncertain whether Roane stepped forward before firing. *See* J.A. 422 (Sergeant Will); J.A. 171–74 (Sergeant Kite). And three witnesses, including Ray, testified that Roane stopped, then stepped towards Jax, and then shot. J.A. 198, 241, 276, 313 (Ray); J.A. 465, 473, 496 (Stephanie Hagy); J.A. 549, 552–55 (Adam Hicks).

---

[2] Lotts also testified that he "can't say if it's true or not" that "Roane took a step back towards Jax prior to firing the shot," J.A. 673–74, but the weight of his testimony appeared to be that Roane did not take such a step.

Nonetheless, in the decision now on appeal, the district court granted Roane's motion for summary judgment. *Ray v. Roane*, No. 5:17-cv-00093, 2022 WL 4479253 (W.D. Va. Sept. 27, 2022). The district court acknowledged the witness testimony that Roane "took one step forward" before he fired his weapon. *Id.* at *5. But that did not count, the court concluded, as "evidence that the threat to Roane ended before the shot was fired." *Id.* Because there was no witness "standing where Roane was standing or behind him," there was nobody (other than Roane) who could testify to Roane's perceptions – whether Roane "would have known that the lead ended and that Jax had reached the end of it," or whether, as Roane asserted, he believed Jax to be unrestrained at the time of the shooting. *Id.* And it followed, the court concluded, that as a matter of law, Roane reasonably feared Jax and made a reasonable "split-second decision" to shoot him. *Id.* Finding no Fourth Amendment violation, the court entered summary judgment for Roane without addressing qualified immunity. *Id.* at *5 n.6.[3]

Ray timely appealed.

## II.

In considering a motion for summary judgment, a district court must view the evidence in the light most favorable to the non-movant – here, Ray – and draw all reasonable inferences in her favor. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).

---

[3] The court also granted Roane summary judgment on Ray's state law conversion claim. *Id.* at *5. Ray does not appeal that ruling and has therefore abandoned the claim. *See Stokes v. Stirling*, 64 F.4th 131, 137 (4th Cir. 2023).

8

The court cannot "weigh the evidence or make credibility determinations." *Id.* (quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015)). That function is reserved for a jury, and only if "the movant shows that there is no genuine dispute as to any material fact" may summary judgment be awarded. Fed. R. Civ. P. 56(a); *see Jacobs*, 780 F.3d at 569.

We review de novo the district court's grant of summary judgment. *Harris*, 927 F.3d at 272. And here, we analyze the district court's decision not only against the record, but for conformity with our previous decision in *Ray*. Of course, the standards on a motion to dismiss and on summary judgment are different, and there is "nothing remarkable in concluding that some plaintiffs whose claims survive a motion to dismiss" – like Ray – "are unable to meet their burden to survive summary judgment." *Graves v. Lioi*, 930 F.3d 307, 317 (4th Cir. 2019). But when a plaintiff does meet her burden to substantiate allegations with facts, then the previous decision "govern[s] how the law applies to those facts." *Id.* at 318. Here, we conclude that the district court's decision is inconsistent with our decision in *Ray* and with the evidentiary record properly evaluated under Rule 56, and we therefore vacate the court's grant of summary judgment.

**A.**

Because the Fourth Amendment regulates officer behavior in light of their reasonable perceptions, *Jones v. Buchanan*, 325 F.3d 520, 528 (4th Cir. 2003), all agree that this case is about what Roane reasonably perceived in the moments before he shot Jax. As relevant here, there are two ways to discern those perceptions. There is Roane's word: what he says he saw. And there are Roane's actions: what his behavior suggests he saw.

9

Roane says that he reasonably perceived Jax as unrestrained and therefore a threat. But because Ray "can point to evidence" – based on Roane's actions – from which a jury could infer that Roane "is not credible on this point," summary judgment is inappropriate. *Id.*

In reaching this conclusion, "[w]e are not writing on a blank slate," *Winston v. Pearson*, 683 F.3d 489, 498 (4th Cir. 2012), and our previous decision in *Ray* all but settles this appeal. As noted above, we relied centrally in *Ray* on two specific allegations from Ray's complaint: "Roane stopped backing away from Jax when the dog reached the end of the zip-lead, and then took a step toward the dog before firing his weapon." 948 F.3d at 228. And we explained why those allegations were so important: If credited, this account of Roane's actions could yield "the reasonable inference" that, contrary to Roane's account of his perceptions, he in fact "observed that the dog could no longer reach him, and, thus, could not have held a reasonable belief that the dog posed an imminent threat." *Id.*

It remained to be seen, of course, whether discovery would bear out these crucial allegations. *See Graves*, 930 F.3d at 317–18. But one point of consensus in this case is that discovery has produced a genuine dispute as to the material facts we identified and emphasized in *Ray*. This much would be hard to deny; as outlined above, the many witnesses to the shooting split 3-2-3 as to whether Roane stopped back-peddling and took a step forward before firing. That means Ray has "met [her] burden to survive summary judgment," *id.* at 317 (cleaned up), generating a dispute resolvable only by crediting one

10

group of witnesses over another – a task for a jury, not a court, *see Jacobs*, 780 F.3d at 568–69.

The district court did not question the "genuineness" of this dispute. Instead, it appeared to treat a concededly genuine dispute over Roane's alleged "step forward" as immaterial. 2022 WL 4479253, at *5. According to the district court, what mattered was that no witness – other than Roane – could testify to Roane's perceptions, given that no witness shared his vantage point. *Id.* (noting that Ray "acknowledged that she does not know what Roane saw or thought at the time because she was not in his position"). And as a result, there was no evidence that would allow a jury to reject Roane's own account, which had him unaware that Jax was leashed at all, let alone at the end of his lead and thus unable to reach Roane. *Id.*

That assessment cannot be squared with our decision in *Ray*. *Ray* already established that the dispute on this record as to whether Roane "stopped backing away from Jax" and then "took a step toward the dog" before firing is indeed material, and highly so. *Ray*, 948 F.3d at 228. That is because a jury crediting the testimony of three witnesses that Roane stopped retreating and stepped *toward* Jax before firing could draw a "reasonable inference" that Roane recognized Jax's inability to advance further and thus the absence of any "imminent threat." *Id.* Contrary to the district court's intimations, in other words, a jury would not be required to accept Roane's account of his own perceptions without question. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022) (cautioning against "simply accepting officer testimony as true"). Instead, if it credited Ray's side of the dispute over the "step forward," it could infer from Roane's actions that "Roane shot Jax

11

at a time when he could not have held a reasonable belief that the dog posed a threat to himself or others," which would in turn establish that "Roane's seizure of Jax was unreasonable." *Ray*, 948 F.3d at 229.

In sum – and at the risk of belaboring what should be a straightforward point – the district court believed that there was no evidence in this record to contradict Roane's testimony that he "did not know about or see the lead" that restrained Jax. 2022 WL 4479253, at *5. But our decision in *Ray* identified two material allegations that would fill this purported evidentiary gap and justify a jury in finding otherwise. Discovery then yielded a genuine dispute about those material allegations. It is time for that dispute to go to a jury for resolution.

Our decision today comes with two important caveats. First, we did not hold in *Ray*, and do not hold today, that a reasonable jury crediting the "step forward" testimony would be *compelled* to infer that Roane knew when he fired that Jax had reached the end of his lead and posed no immediate threat. That would be a "reasonable inference," *Ray*, 948 at 228, but that does not make it the only one available. Perhaps, for instance, Roane could persuade a jury that he stepped toward Jax despite believing the dog continued to charge at him unrestrained so that he could get a cleaner shot. *Cf.* J.A. 174 (Sergeant Kite denying that Roane stepped forward but explaining that he might have stopped his retreat "to fire a shot"); *but see* J.A. 86 (Roane testifying that he was "running backwards" when he fired). The point is not that the "step forward" evidence, if credited, necessarily would lead to a verdict for Ray but that it could lead to such a verdict: It "may not necessarily refute

12

[Roane's] story, but it might be reasonably arranged by a jury into a . . . version of events that does." *Stanton*, 25 F.4th at 236. A jury, not a court, must do that arranging.[4]

Second, as we emphasized at the outset, the fact that a plaintiff's complaint survived a motion to dismiss does not mean that summary judgment is foreclosed. *Graves*, 930 F.3d at 317. Had "[d]iscovery produced substantially different facts than [Ray] alleged in her [c]omplaint," then notwithstanding our decision in *Ray*, summary judgment could well be available to Roane. *Id.* at 318. But that is not what happened. Instead, if a jury credits the evidence produced in discovery that is most favorable to Ray – as we must assume for present purposes it will – then that jury will arrive at a scene almost identical to the one painted in the complaint. And that scene will culminate in the action that we held in *Ray* would justify an inference that Roane understood Jax to pose no immediate threat: Roane "stopping," "stepping back in," and then shooting the dog. J.A. 198 (cleaned up); *see also*

---

[4] Our court recently discussed the respective roles of courts and juries in Fourth Amendment cases turning on the objective reasonableness of officer actions. *See Armstrong v. Hutchenson*, 80 F.3d 508, 513–15 (4th Cir. 2023). The ultimate question of objective reasonableness, we opined, is a purely legal issue for a court to decide, while disputes over material historical facts are to be decided by juries. *Id.* at 514–15. However that division of labor might apply in future cases, it has no bearing in this one, because our court *already* has decided the ultimate legal question. If a jury credits Ray's allegations and draws permissible inferences in her favor – finding that Roane was aware when he shot Jax that the dog could no longer reach him – then it follows, we held in *Ray*, that Roane lacked a "reasonable belief that the dog posed an imminent threat," making the shooting "an unreasonable seizure" under the Fourth Amendment. 948 F.3d at 228, 229; *see, e.g., United States v. Yengel*, 711 F.3d 392, 399 (4th Cir. 2013) (explaining importance of evidence that officer did not in fact perceive an emergency to objective reasonableness inquiry). In this case, in other words, the legal work is done, and what remains is only for the jury to decide the facts.

13

J.A. 241, 276, 313, 473–74, 554.[5]  Under these circumstances and given our decision in

*Ray*, the district court erred in holding that Roane was entitled to judgment as a matter of

law on the merits of Ray's Fourth Amendment claim.

**B.**

We may deal more briefly with Roane's alternative argument that he is entitled to

qualified immunity on Ray's Fourth Amendment claim as a matter of law.  As we explained

in *Ray*, a government official who violates the Constitution might nonetheless be shielded

from liability under the second prong of the qualified immunity analysis if "clearly

established" law would not have put a "reasonable officer" in his position on notice "that

his conduct was unlawful."  948 F.3d at 228.  We analyze Roane's entitlement to qualified

immunity using the same evidentiary record that informed our analysis of the constitutional

merits:  "[U]nder either prong" of the qualified immunity inquiry, "courts may not resolve

genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*,

---

[5] Nor is this a case in which new evidence produced in discovery, necessarily unaccounted for in our prior opinion, renders immaterial the allegations on which we previously relied. *Cf. Graves*, 930 F.3d at 318 (holding that law-of-the-case doctrine does not apply where discovery produces "substantially different facts" than alleged, requiring reviewing court to "alter [its] understanding of the factual underpinnings" of the plaintiff's claim).  The district court did rely in part on new testimony that Jax had "gotten off his lead" in the past, implying that Roane might reasonably have perceived Jax as a threat even if he did know that Jax was tethered at the end of the lead.  2022 WL 4479253, at *5.  But as noted above, our inquiry focuses on what Roane reasonably perceived based on the information in his possession at the time of the shooting, rejecting "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see Lee v. Fort Mill*, 725 F. App'x 214, 218 nn. 4 & 5 (4th Cir. 2018).  And there is of course no suggestion that Roane, who testified he was entirely unaware of the tether system restraining Jax, knew at the time of any vulnerability in that system, or believed that Jax was tethered but at risk of breaking free.

14

572 U.S. 650, 656 (2014) (per curiam); *see also Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).

Our decision in *Ray* forecloses Roane's entitlement to qualified immunity on summary judgment. We explained in *Ray* that if "Roane shot Jax at a time when he could not have held a reasonable belief that the dog posed a threat to himself or others," he violated clearly established law and qualified immunity cannot protect him. 948 F.3d at 229. And as we explain above, discovery yielded a genuine dispute over facts from which a jury could infer that Roane did just that. "The question of whether a reasonable officer would have known that the conduct at issue violated" a clearly established right "cannot be decided prior to trial if disputes of the facts exist." *Id.* at 228. This is just such a case, and for the same reason that Roane's merits argument cannot be resolved as a matter of law, we cannot find, in this posture, that Roane is entitled to qualified immunity as a matter of law.

## III.

For the reasons given above, the district court's judgment is vacated and the case remanded for trial.

*VACATED AND REMANDED*

15